[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-10713

_____

D.C. Docket No. 8:12-cv-01342-PAZ


MICHELLE ZUBA-INGRAM,

Plaintiff - Appellant,

versus

COMMISSIONER OF SOCIAL SECURITY,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(January 26, 2015)

Before MARCUS and JILL PRYOR, Circuit Judges, and HINKLE,[*] District
Judge.

---

[*] Honorable Robert L. Hinkle, United States District Judge for the Northern District of Florida,
sitting by designation.

PER CURIAM:

Michelle Zuba-Ingram appeals the magistrate judge's order affirming the denial of her application for a period of disability, disability insurance benefits, and supplemental security income by the Social Security Administration ("SSA").[1] We affirm.

## I.  BACKGROUND

In August 2009, Zuba-Ingram filed applications for a period of disability, disability insurance benefits, and supplemental security income, under Titles II and XVI of the Social Security Act.  Her applications were denied initially, but Zuba-Ingram was granted a hearing before an administrative law judge ("ALJ").  In a pre-hearing brief, Zuba-Ingram contended she suffered from severe post-traumatic stress disorder ("PTSD"), depression, anxiety with panic disorder, and agoraphobia.  She asserted an alleged onset date of June 4, 2009.  She further alleged she had been physically assaulted while serving in the military, and had also been abused as a child.

During her October 2010 hearing, Zuba-Ingram testified she was 47, had attained one master's degree, and was close to obtaining a second.  She had three children, ages 25, 17, and 11.  She previously had worked as a middle-school

---

[1] The parties consented to disposition by a magistrate judge.

teacher but left that job in 2007, because regularly occurring fights at the school caused her to experience flashbacks of "stuff that had happened to [her]." Zuba-Ingram also had worked nights at a hardware store for approximately six months in 2008, but had been unable to adjust to the late hours. During that time, she also had experienced flashbacks, migraine headaches, and panic attacks. She had taken several medications that occasionally caused her to feel dizzy and to be unable to focus.

Zuba-Ingram testified she was seeing a therapist at least once each week and a social worker several times per month. She was being treated by a United States Department of Veterans Affairs ("VA") psychiatrist approximately once every five weeks. The ALJ asked Zuba-Ingram whether she could work in a job requiring no interactions with others, such as in landscaping. She responded she would be very anxious about being on others' property and speaking with them.

During examination by Zuba-Ingram's attorney, she testified her migraine headaches typically started without warning but occasionally were preceded by a "feeling in [her] neck." She had experienced 4 headaches during the month preceding her hearing and approximately 20-22 in the prior year. Some months she experienced no headaches, while at other times she experienced 3 in one week. She was unsure how long the migraines lasted because of the side effects of medication she took to treat them.

3

The ALJ determined Zuba-Ingram could not perform her past relevant work. The ALJ asked a vocational expert ("VE") to identify jobs Zuba-Ingram could perform for her age, education, and experience, provided (1) she had no exertional limitations; (2) she needed to avoid unprotected heights, heavy equipment, and operating machinery; and (3) she could carry out simple, routine, repetitive work that did not change daily and involved limited interactions with others and no team coordination. The VE identified three jobs: hand-packager, assembler, and groundskeeper.

The ALJ asked the VE to identify the maximum number of absences that would be accommodated without losing one's job. The VE responded: "Three times in a month which would be ten to 12 times in a total year. So after five months of two absences that person would be terminated from employment." When asked whether jobs existed for one who could work eight hours per day only "on an unpredictable basis," the VE responded that such an individual would be unemployable.

In support of her application, Zuba-Ingram submitted records related to her previous disability claim to the VA for her PTSD and migraines. The VA's December 1, 2009 report included information resulting from examinations of Zuba-Ingram by several VA medical professionals. Neurophysiology fellow Jonathan M. Johnson, M.D., opined Zuba-Ingram had reported "continued

4

problems with frequent headaches" attributed to an assault in 1983, during which an assailant hit Zuba-Ingram numerous times in the head with fists and a night stick. Since that time, the frequency of the headaches had decreased, and Zuba-Ingram currently was experiencing an average of approximately 3 headaches every three to four months. They occurred "in clusters of two or three within a few weeks of each other and [would] then . . . be absent or rare for a month or two." While experiencing the headaches, Zuba-Ingram was "unable to function or tolerate social interaction and require[ed] sleep in a dark quiet room" until they subsided. The headaches had been present for years, and no clear change in this pattern appeared over the previous one to two years. Dr. Johnson's assessment was, because of blunt trauma, Zuba-Ingram had developed migraine headaches that "appear[ed] to be relatively stable but . . . interfere[d] with her ability to function during acute attacks."

Amy Connell, M.D., reported Zuba-Ingram had a history of substance abuse in remission. In addition to the 1983 assault, Dr. Connell also discussed a three-day-long physical assault in 1982 that had rendered Zuba-Ingram unconscious. Zuba-Ingram had attributed continuing migraine headaches to the 1983 assault. Dr. Connell discussed at length Zuba-Ingram's history of physical abuse and self-harm, which included two suicide attempts and psychiatric hospitalizations.

5

Dr. Connell diagnosed Zuba-Ingram with chronic PTSD, major depressive disorder, and borderline personality disorder.

Amy Krohn, M.D., a VA staff psychiatrist, stated she had been treating Zuba-Ingram since October 2007.  Dr. Krohn reported Zuba-Ingram suffered from PTSD resulting from a traumatic physical assault while she was serving in the military.  Dr. Krohn discussed several of Zuba-Ingram's PTSD symptoms in detail, noted that she did not suspect malingering, and stated Zuba-Ingram had been unemployable because of PTSD since June 2009.  Dr. Krohn's letter did not mention migraine headaches.  An April 26, 2010, letter contained similar information.

Consultative examiner John L. Peggau, Psy.D., a clinical psychologist, examined Zuba-Ingram on November 16, 2009.  Zuba-Ingram reported suffering from PTSD, anxiety, panic attacks, and depressive episodes.  She informed Dr. Peggau about an incident in the military, when a male officer had locked her in his room and had physically assaulted her.  She reported taking three medications for migraine headaches.  According to Dr. Peggau:

> [Zuba-Ingram] said that she estimates monthly migraine headaches but all of this was very vague and she kept changing her frequency from monthly to "not in quite a long while sometimes."  She acted as if she was crying but there were never any tears.  She was extremely labile and dramatic with a theatrical presentation that had a

6

large questionable component of malingering or gross embellishment and acting.

Dr. Peggau further reported Zuba-Ingram "was lacking in specifics and in detail when asked direct question[s].  Instead, she would often just go on discussing other things."  Dr. Peggau diagnosed Zuba-Ingram with anxiety disorder and personality disorder "with borderline and histrionic features, severe."

On November 25, 2009, state agency consultant Michele Womontree, Psy.D., completed a mental Residual Functional Capacity ("RFC") assessment for Zuba-Ingram.  Her assessment was Zuba-Ingram had experienced moderate limitations in various work-related and social-functioning abilities. Dr. Womontree opined Zuba-Ingram should be engaged in work involving "highly structured and routinized tasks which need not be simple but should have clear, unchanging expectations," and "in a situation where there are not many social interactions or expectations."  Dr. Womontree did not address Zuba-Ingram's headaches.

Based on the accumulated evidence, on December 11, 2009, the VA granted Zuba-Ingram a "service connection"[2] for PTSD and "major depressive disorder (also claimed as anxiety and panic attacks)," with an evaluation of 70%, effective

---

[2] A "service connection" refers to a showing that a particular injury or disease resulting in disability was incurred coincident with, or was aggravated during, military service.  38 C.F.R. § 3.303(a).

June 2008.  A service connection also was granted for post-traumatic migraine headaches related to Zuba-Ingram's 1983 assault, with an evaluation of 30%, effective October 2009.  The decision explained:

> We have assigned an evaluation of 30 percent based on the VA exam of November 2009 that stated you currently experience 3 headaches per 3-4 month period and that your headaches cause you to be unable to function or tolerate social interaction and require sleep in a dark and quiet room until they subside.  Although your symptoms do not exactly meet the criteria for a 30 percent evaluation, based on your overall constellation of symptoms, we consider your headaches to be incapacitating and occur once a month on average. Therefore, the higher evaluation of 30 percent has been assigned.
>
> A higher evaluation of 50 percent is not warranted unless there are very frequent, completely prostrating, and prolonged attacks productive of severe economic inadaptability.

These evaluations were continued in an August 2010 VA rating decision, which concluded Zuba-Ingram was unemployable because of PTSD as of December 28, 2009.  As to Zuba-Ingram's headaches, the 2010 VA decision explained:

> The VA neurological examiner of July 8, 2010, concurred with the November 23, 2010[3] examiner's diagnosis/medical opinion, and stated that your headaches do not limit you from any sort of work other

---

[3] This date appears to be a typographical error.  A VA examiner previously had seen Zuba-Ingram on November 23, 2009.

8

than the fact that you have an occasional absence from work during headache flares.  The core of your individual unemployability claim vests in your post-traumatic stress disorder symptoms.

In addition to the evidence preceding the VA's decision, Zuba-Ingram submitted subsequent evidence to the ALJ.  A February 2010 disability determination services ("DDS") summary noted Zuba-Ingram had been treated for headaches in May 2008.  An October 2009 DDS summary had identified headaches as one of several active problems in August 2009, again without elaboration.

In a letter dated April 29, 2010, Marianne Geiger, M.D., a psychiatrist Zuba-Ingram had not seen since 2007, stated:

> I have been Michelle Zuba-Ingram's treating physician for several years.  During that time she has had bouts of severe depression, self-injurious behavior, and several incidents of suicidal ideation for which I had to call the police for transport to a psychiatric facility.  She has been unable to tolerate the demands of staying employed.  All of this, in my opinion, is due to major depression and PTSD and is related to the severe migraines she experiences.  To date the medications we have tried have had only partial efficacy.  I believe her to be disabled and unable to perform the duties of any and all employment.

Zuba-Ingram also submitted VA progress notes discussing her medical care between February and September 2010.  These notes contained several references to severe PTSD, anxiety, depression, flashbacks, and self-harm.  They also contained the scattered references to headaches.

9

In a January 10, 2011, decision, the ALJ concluded Zuba-Ingram had not been disabled since her alleged onset date of June 4, 2009.  The ALJ determined Zuba-Ingram had not engaged in substantial gainful activity since her alleged onset date and had the following severe impairments: PTSD, anxiety, substance abuse in remission, and migraine headaches.  But Zuba-Ingram did not have an impairment or combination of impairments that met or equalled a listed impairment.  The ALJ concluded Zuba-Ingram had (1) no restrictions in daily-living activities; (2) moderate difficulties in social functioning and in concentration, persistence, or pace; and (3) one extended-duration episode of decompensation.

The ALJ further determined Zuba-Ingram retained a maximum RFC to perform a full range of work at all exertional levels, subject to the following nonexertional limitations: (1) the need for simple, routine, repetitive tasks that stay the same day to day and involve no team coordination and only minimal interaction with others; and (2) the need to avoid unprotected heights, heavy equipment, and operating machinery.  The ALJ discussed several of the symptoms alleged by Zuba-Ingram, including her assertion that she experienced migraine headaches because of a past physical assault.  The ALJ concluded Zuba-Ingram's medically determinable impairments reasonably could be expected to cause the alleged symptoms.  Zuba-Ingram's statements concerning the intensity, persistence, and limiting effects of those symptoms were not credible, to the extent

10

they were inconsistent with the ALJ's RFC assessment.  While acknowledging Zuba-Ingram's history of significant trauma, the ALJ noted her treatment generally had been successful in reducing or controlling her symptoms.

The ALJ determined Zuba-Ingram's testimony concerning the limiting effects of her symptoms, including her allegations of unpredictable migraines 4 times per month, were contradicted by the daily-living and work activities Zuba-Ingram had engaged in immediately before her alleged onset date and July 2009 hospitalization.  The ALJ declined to credit Dr. Geiger's contrary one-paragraph April 2010 statement, because Zuba-Ingram had not seen Dr. Geiger since 2007.  Very limited weight also was assigned to the opinions of Dr. Krohn, whose statement that Zuba-Ingram had been unable to work for some time was inconsistent with the record.  The ALJ accorded substantial weight to the state agency consultants' opinions, because they were well-reasoned and consistent with other evidence.

The ALJ further concluded Zuba-Ingram was unable to perform any past relevant work.  Nevertheless, considering her age, education, work experience, and RFC, in conjunction with the 20 C.F.R. Part 404 Medical-Vocational Guidelines, there were significant numbers of jobs in the national economy Zuba-Ingram could perform.  The Appeals Council denied Zuba-Ingram's request for review in April 2012.

11

Zuba-Ingram sought review in district court.  She filed a memorandum and argued the ALJ had erred in evaluating her migraine-headache pain and failed to provide sufficient reasons for discrediting her complaints.  She supported her testimony concerning her migraine headaches with her medical records.  Zuba-Ingram further argued the ALJ erred by failing to give any weight to the 30% disability rating assigned by the VA for her headaches.

The magistrate judge affirmed the ALJ's decision.  The magistrate judge concluded the record contained little objective evidence to support Zuba-Ingram's claims regarding the limiting effects of her migraine headaches.  The Social Security regulations endorsed the ALJ's conclusion he was not bound by the VA's disability findings.  The ALJ also would have been entitled to reject the VA's ratings based solely on his credibility finding.  Although the ALJ should have explained in greater detail the weight he afforded to the VA's findings, the magistrate judge determined the error was harmless.

## II.  DISCUSSION

Zuba-Ingram argues on appeal the ALJ failed to provide sufficient reasons for discrediting her complaints about pain caused by her migraine headaches.  She contends the ALJ erred by failing to address the frequency, intensity, and duration

12

of her headaches in the RFC findings and by failing to include a finding regarding the severity of her limitations.[4]

"In Social Security appeals, we must determine whether the Commissioner's decision is supported by substantial evidence and based on proper legal standards." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (citation and internal quotation marks omitted). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (citation and internal quotation marks omitted). "We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the Commissioner." *Id.* (alteration, citation, and internal quotation marks omitted). A litigant who offers no substantive argument on an issue in her initial brief abandons that issue on appeal. *Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008).

The Commissioner uses a five-step, sequential evaluation process to determine whether a claimant is disabled. *Winschel*, 631 F.3d at 1178. The first three steps ask whether the claimant (1) currently is engaged in substantial gainful activity and (2) has a severe impairment or combination of impairments (3) that meet or equal the severity of the specified impairments in the Listings. *Id.* The

---

[4] Zuba-Ingram has not argued in this court that the ALJ erred in not according the VA's migraine-headache disability rating appropriate weight. Therefore, she has abandoned that argument on appeal. *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004).

13

fourth step asks whether, based on the claimant's RFC assessment, the claimant can perform any of her past relevant work. *Id.* The RFC is that which an individual still is able to do despite the limitations caused by her impairments. *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004). The ALJ must consider all of the evidence in the record in determining the claimant's RFC. *See id.* The final step asks whether there are significant numbers of jobs in the national economy the claimant can perform, given her RFC, age, education, and work experience. *Winschel*, 631 F.3d at 1178.

To establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test by showing "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (per curiam).

In weighing the evidence, "credibility determinations are the province of the ALJ." *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005) (per curiam). If the ALJ discredits a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson*, 284 F.3d at 1225. A clearly articulated credibility finding supported by record evidence will not be disturbed on appeal. *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995) (per curiam).

14

By failing to state any arguments on appeal in support of any disability claims Zuba-Ingram may have had based on impairments other than migraine headaches, she has abandoned this issue. *See Timson*, 518 F.3d at 874. She has not shown the ALJ erred in failing to credit her allegations concerning the limiting effects regarding her migraine headaches or failed to explain adequately his decision. Zuba-Ingram testified she had experienced approximately 20-22 migraine headaches in the year preceding her hearing. This testimony was inconsistent with Dr. Johnson's December 2009 report, which showed the frequency of her headaches had decreased over the years, and she was experiencing an average of approximately 3 headaches every three to four months in 2009. Zuba-Ingram's December 2009 VA rating decision similarly reported she experienced 3 headaches every three to four months. Aside from Dr. Johnson's report, the totality of Zuba-Ingram's medical records contained only scattered, isolated references to migraine headaches.

The ALJ was entitled to find Zuba-Ingram's testimony regarding her prior employment, daily activities, and travels called into question her allegations concerning the limiting effects of her migraine headaches. She did not indicate migraine headaches interfered with travelling or daily activities. Her testimony as to the limiting effects of flashbacks in prior jobs similarly did not refer to migraine headaches. The ALJ was entitled to assign limited weight to Dr. Geiger's opinion

that Zuba-Ingram was unemployable, because Zuba-Ingram testified she had not seen Dr. Geiger in approximately two years. She also has not shown the ALJ erred in his assessment of Dr. Krohn's letters, because they did not mention migraine headaches.

Zuba-Ingram's argument that the ALJ's RFC assessment inadequately accounted for her headaches is misplaced. The ALJ's conclusion as to Zuba-Ingram's maximum RFC shows the ALJ determined she had not established credible RFC limitations regarding her headaches. The factual findings underlying the VA's migraine-headache-disability rating, including Zuba-Ingram's having experienced 3 headaches every three to four months, were consistent with the ALJ's conclusion she could work. Accordingly, we hold that the Commissioner's decision is supported by substantial evidence and based on proper legal standards.

**AFFIRMED.**

16